# THE STATE OF SOUTH CAROLINA
## In The Court of Appeals

Stewart Buchanan, #69848, Appellant,

v.

South Carolina Department of Probation, Parole, and Pardon Services, Respondent.

Appellate Case No. 2019-001554

———————

Appeal From The Administrative Law Court
Ralph King Anderson, III, Administrative Law Judge

———————

Opinion No. 6021
Heard May 3, 2023 – Filed August 30, 2023
Withdrawn, Substituted, and Refiled October 18, 2023

———————

## AFFIRMED

———————

Hannah Lyon Freedman, of Justice 360, and John H. Blume, III, of Law Office of John Blume, both of Columbia, for Appellant.

Matthew C. Buchanan, of South Carolina Department of Probation, Parole and Pardon Services, of Columbia, for Respondent.

———————

**THOMAS, J.:** Stewart Buchanan appeals the order of the Administrative Law Court (ALC), which affirmed the denial of parole by the Parole Board of the South Carolina Department of Probation, Parole and Pardon Services (the Board), arguing (1) the Board's procedures violated his right to due process and (2) his

forty-seven years of incarceration for a crime he committed as a juvenile constitutes cruel and unusual punishment. We are constrained to affirm.

**FACTS**

On May 18, 1973, Buchanan broke into the victim's home in the early morning hours. The victim, Buchanan's neighbor, awoke and fled the house. Buchanan stabbed her to death in the front yard. Buchanan, who was seventeen years old at the time, was under the influence of a mix of drugs and alcohol and a lack of sleep. In September of 1973, Buchanan pled guilty to murder and was sentenced to life imprisonment. At the time, an individual sentenced to life in South Carolina was eligible for parole upon the service of ten years. The trial court made a confidential report from Buchanan's psychiatrist available to the jury, which returned a verdict of guilty with a recommendation of mercy.[1]

Buchanan first appeared before the Board on January 12, 1983, and was denied parole. He has now appeared before the Board at least eighteen times and been denied parole each time. Regarding the most recent denial in November 2018, parole was denied due to: (1) the nature and seriousness of the offense; (2) an indication of violence in this or a previous offense; and (3) the use of a deadly weapon in this or a previous offense.

Prior to the most recent parole hearing, Buchanan submitted a Memorandum in Support of Favorable Parole Recommendation. The memo reported Buchanan had "more than demonstrated his rehabilitation and reformation through his positive institutional record and participation in numerous counseling, rehabilitative[,] and religious programs." The memo argued the Board should consider the factors enumerated in *Aiken v. Byars*.[2]

---

[1] At the time of the hearing, the death penalty had been abolished, yet a jury still determined whether to recommend mercy.

[2] 410 S.C. 534, 765 S.E.2d 572 (2014). The *Aiken* court held that a sentencing court considering a sentence of life without parole (LWOP) for a juvenile offender must consider:

> (1) the chronological age of the offender and the hallmark features of youth, including "immaturity, impetuosity, and failure to appreciate the risks and consequence";

As to the first factor, the hallmark features of youth, the memo explained Buchanan was a juvenile at the time of the crime, with a juvenile's lack of maturity, underdeveloped sense of responsibility, and incomplete neurological development. The memo notes Buchanan's childhood was tumultuous with an unstable family life, difficulties at school, and a peer group that was involved with drugs and alcohol. His parents were absent most of the time, his older sister had just run away from home, he spent time in a boys' home, and he "began engaging in attention seeking behavior at home and at school . . . ."

Regarding the second factor, family and home environment, the memo reported that Buchanan's father was "an alcoholic who drifted from job to job" and when he was home, enforced corporal punishments, including backhanding, punching in the face, and hitting with a belt. Buchanan's mother was "cold and aloof" and highly critical of her children. In addition, she once allegedly attempted to run over one of Buchanan's father's mistresses and threatened to leave her husband many times "and did a few times for short periods of time." The family moved to Fort Mill, a town of less than 3,000 at the time, when Buchanan was seven years old. Buchanan did not fit in well in the small community. He was overweight, weighing over 200 pounds by the time he was sixteen years old. He was teased at school and became the class clown, often getting in trouble. After his older sister,

> (2) the "family and home environment" that surrounded the offender;
> (3) the circumstances of the homicide offense, including the extent of the offender's participation in the conduct and how familial and peer pressures may have affected him;
> (4) the "incompetencies associated with youth—for example, [the offender's] inability to deal with police officers or prosecutors (including on a plea agreement) or [the offender's] incapacity to assist his own attorneys"; and
> (5) the "possibility of rehabilitation."

*Id*. at 544, 765 S.E.2d at 577 (alterations in original) (quoting *Miller v. Alabama*, 567 U.S. 460, 477–78 (2012)). These factors are generally referred to as the *Miller* factors. The parties here also refer to them as the *Aiken* factors.

who acted somewhat as a surrogate mother to him, ran away, and Buchanan returned from a short stay at a boys' home, he "turned to drinking and drugs."

The memo describes Buchanan's situation at the time of the offense when considering the third factor from *Miller*, the circumstances of the offense. During the summer of 1973, Buchanan began using methamphetamines and LSD, had stopped attending his auto mechanics classes at York Technical College, was working night shifts, and was not sleeping. The night of the offense, he took several hits of LSD and drank excessively. His recollection of the night in question was "a blur." Buchanan admitted to the police that he committed the offense and told them "he did not have complete control of his actions that night." However, "[t]hen and now[, he] takes full responsibility for his actions and the consequences thereof."

In its discussion of the fourth factor, the incompetency of youth when dealing with the criminal justice system, the memo notes that at the time he pled guilty, Buchanan accepted the advice of his attorney, who "virtually guaranteed him that he would be paroled in less than twenty years" because many persons convicted of murder were granted parole after ten years of service, and it was rare not to be granted parole after twenty years.

Finally, as to the fifth factor, the possibility of rehabilitation, the memo notes Buchanan has spent the last forty-five years incarcerated and has taken advantage of the opportunities available to him. While he was still seventeen years old, he became part of Manning's Comprehensive Drug Abuse Program by visiting schools and churches to dissuade other teenagers from using drugs. Within the prison, he has been certified as a literacy tutor for more than forty years. He tutors, teaches English at night school, and started his own course to teach inmates basic legal research and writing. He has also worked as a volunteer Inmate Grievance Clerk and a hospice volunteer, and is a member of the Character Based Unit (a society of inmates focused on rehabilitation), which is demanding and requires a good disciplinary history, ability to contribute, demonstrated interest in rehabilitation, mental stability, and credibility. Buchanan volunteers as a chaplain in the prison and, when on work release, he is actively involved with Trinity Baptist Church and Kairos, a Christian ministry program.

In addition, Buchanan has been enrolled in the release plan, Jump Start. He was to graduate on November 14, 2018, "at the Blue Level — the highest possible level of completion." Jump Start is a Christian-based organization that focuses on transitioning men back into the workforce and society after prison. As a parolee

and graduate of Jump Start, Buchanan would be provided transitional housing for two years, be mentored, and receive assistance getting a job and eventually buying a home. He completed extensive business and vocational courses, completed more than 500 hours of carpentry training, and worked as a manager for Astro Glass during a work release program. Buchanan submitted numerous certificates of training, volunteerism, and education, and letters in support of his parole from educators, potential and past employers, and prison employees.

Dr. Susan Knight, a forensic psychologist, examined Buchanan in preparation for the parole hearing. She noted Buchanan had some disciplinary charges during his incarceration; however, she concluded he did not represent a significant risk for future violent acts. Dr. Knight interviewed numerous employers, prison employees, a chaplain, and others, who positively described Buchanan as follows: a model inmate; a hard worker; a "really good, really respectful guy"; of "good character"; respected and well-liked by other inmates; helpful to other inmates; smart; deeply involved in religion; "If he got out tomorrow, I would be happy to know he bought a home on my street"; sincere, articulate, and honest; and remorseful. Dr. Knight concluded Buchanan suffered from no psychological disorders and found, "[H]is prison record indicates an exceptionally-responsible worker, with very few physical altercations, and a positive demeanor and attitude. Collateral and interview data indicate [he] expressed remorsefulness[] and [the] ability for empathy."

Dr. Knight reviewed the criteria used by the Board and concluded that, as to the nature and seriousness of the offense, Buchanan took full responsibility, demonstrated remorse, and recognized with good insight the factors that facilitated his substance abuse. As to his adjustment while in confinement, Dr. Knight reiterated Buchanan's many accomplishments and honors. Regarding her assessment of Buchanan's risk to the community, Dr. Knight found he was at low risk for future violent recidivism, and she identified substance abuse treatment as his primary risk management strategy. Finally, as to the Board's criterion of the adequacy of an offender's parole plan, Buchanan has been approved for two years of housing at Jump Start and has the opportunity of employment in a ministry and involvement through Jump Start in woodworking, a furniture company, and other construction.

Buchanan's attorney also submitted a letter to the Board, arguing that after *Aiken*, it needed to consider Buchanan's "youth and its attendant circumstances and provide a meaningful opportunity for release." The letter requested the Board (1) hire an expert in adolescent brain development and consider the expert's written

evaluation; (2) schedule the parole hearing at a different time from hearings for adult offenders and allow testimony from mental health professionals and other witnesses; and (3) consider the factors of youth, including the incompetency of youth regarding the legal system, immaturity, home and community environment at the time of the offense, evidence of remorse, and efforts made toward rehabilitation.

The Board responded to the letter, arguing Buchanan was not being denied any constitutional rights. The Board noted, "Though [its] reasons for denial . . . will never change, these reasons for denial are legal . . . ." The Board also stated, "As long as it is revealed that the Board applied the mandatory criteria, the use of the events of the offense as a reason for denial is lawful."

At the hearing before the Board, Buchanan was represented by his attorney and accompanied by three pastors and Dave Johnson from Jump Start. Buchanan explained the events of the offense and his subsequent involvement in a comprehensive drug abuse therapy program, Narcotics Anonymous, and Alcoholics Anonymous. Buchanan's attorney spoke on his behalf. Pastor Tammy Blom also spoke on his behalf, concluding she envisioned Buchanan "moving into Jump [S]tart after leaving prison." Pastor Frank Ledvinka also spoke, indicating he believed in Buchanan, saw Buchanan's great love of God and others, and asked the Board to give him a chance. The hearing indicates the Board had "71 signatures in opposition." According to Buchanan, the Board deliberated for less than a minute before verbally denying his request for parole. In a subsequent letter, the Board stated it considered the following in denying parole:

> (1)     the characteristics of your current offense(s), prior offense(s), prior supervision history, prison disciplinary record, and/or prior criminal record . . . ;
> (2)     the factors published in Department Form 1212 (Criteria for Parole Consideration);
> (3)     the factors outlined in Section 24-21-640 of the South Carolina Code of Laws[;] and
> (4)     actuarial risk and needs assessment factors pursuant to Section 24-21-10(F)(1) of the South Carolina Code of Laws.

Buchanan appealed to the ALC.

In its order affirming the Board, the ALC noted its review was confined to a determination of whether the Board's denial of parole afforded Buchanan due process and was consistent with *Cooper v. South Carolina Department of Probation, Parole & Pardon Services*.[3] The ALC rejected Buchanan's argument that recent case law had created a new substantive constitutional right to a "meaningful" parole review for inmates who were sentenced as juveniles, which required the Board to expressly consider an inmate's youth in determining parole. In addition, the ALC found it did not have the authority to "establish a new substantive constitutional right." The ALC denied Buchanan's request that it order the Board to grant parole. This appeal followed.

## STANDARD OF REVIEW

Section 1-23-610(B) of the South Carolina Code (Supp. 2022) sets forth the standard of review when the court of appeals is sitting in review of a decision by the ALC on an appeal from an administrative agency. The court of appeals may reverse or modify the decision only if substantive rights of the appellant have been prejudiced because the decision is clearly erroneous in light of the reliable and substantial evidence on the whole record, arbitrary or otherwise characterized by an abuse of discretion, or affected by other error of law. *Id.*

## LAW/ANALYSIS

### A. Due Process

Buchanan argues the "legal sea change" applicable to juvenile *sentencing* during the past decade or so requires the Board to adopt procedures that will allow juvenile offenders to have their youth and immaturity considered in *parole decisions*. *See Roper v. Simmons*, 543 U.S. 551, 578 (2005) ("The Eighth and Fourteenth Amendments forbid imposition of the death penalty on offenders who were under the age of 18 when their crimes were committed."); *Miller*, 567 U.S. at 489 (finding juveniles convicted of homicide could not be subjected to mandatory LWOP sentences, "regardless of their age and age-related characteristics and the nature of their crimes" because to do so would "violate [the] principle of proportionality, and so the Eighth Amendment's ban on cruel and unusual punishment"); *Graham v. Florida*, 560 U.S. 48, 74 (2010) (holding "that for a juvenile offender who did not commit homicide[,] the Eighth Amendment forbids

---

[3] 377 S.C. 489, 500, 661 S.E.2d 106, 112 (2008), *abrogated on other grounds by Allen v. S.C. Dep't of Corr.*, 439 S.C. 164, 886 S.E.2d 671 (2023).

the sentence of life without parole"); *Montgomery v. Louisiana*, 577 U.S. 190, 212–13 (2016) (giving *Miller* retroactive effect and stating, "In light of what this Court has said in *Roper*, *Graham*, and *Miller* about how children are constitutionally different from adults in their level of culpability, however, prisoners like Montgomery must be given the opportunity to show their crime did not reflect irreparable corruption; and, if it did not, their hope for some years of life outside prison walls must be restored.").

South Carolina recognized these principles in *Aiken* as to sentencing, holding the sentences of "fifteen inmates who were sentenced to life without parole as juveniles" violated the Eighth Amendment under *Miller*. 410 S.C. at 536–37, 765 S.E.2d at 573. Our supreme court acknowledged the "affirmative requirement that courts fully explore the impact of the defendant's juvenility on the sentence rendered." *Id.* at 543, 765 S.E.2d at 577. *Aiken* held that a sentencing court considering an LWOP sentence for a juvenile offender must consider the *Miller* factors. *Id.* at 544, 765 S.E.2d at 577.

Buchanan argues the Board's current parole review process violates his due process rights by not also requiring the Board to consider these factors in reviewing his parole applications. Buchanan notes that fifteen of his eighteen parole denials cite, virtually verbatim, the same three reasons for denial:

> (1) the nature and seriousness of the current offense;
> (2) an indication of violence in this or a previous offense; and
> (3) the use of a deadly weapon in this or a previous offense.

According to Buchanan, the Board's process is insufficient because it does not require the Board to consider his youth and rehabilitation. Buchanan argues many jurisdictions have judicially or legislatively required parole boards to specifically consider the "hallmark features of youth" in considering parole of juvenile offenders.

The Board argues the change in the law as it relates to juvenile sentencing has not been extended beyond sentencing in South Carolina, maintaining *Miller* and *Aiken* require the factors of youth be considered only by the sentencing court, not the Board. *Id.* at 544, 765 S.E.2d at 577 (explaining that *Miller* mandates consideration of the factors of youth by "the sentencing authority"). In addition, the Board maintains that because Buchanan's sentence provides for parole *eligibility*, *Miller* and *Aiken* do not apply. *See Montgomery*, 577 U.S. at 212 ("A

State may remedy a *Miller* violation by permitting juvenile homicide offenders to be considered for parole, rather than by resentencing them.").

The statutory factors that must be considered by the Board are as follows:

> The board must carefully consider the record of the prisoner before, during, and after imprisonment, and no such prisoner may be paroled until it appears to the satisfaction of the board: that the prisoner has shown a disposition to reform; that in the future he will probably obey the law and lead a correct life; that by his conduct he has merited a lessening of the rigors of his imprisonment; that the interest of society will not be impaired thereby; and that suitable employment has been secured for him.

S.C. Code Ann. § 24-21-640 (Supp. 2022). In addition, the Board must consider the factors enumerated in its parole form.[4]

---

[4] The current list of the factors on Form 1212 are as follows:
  1. The risk the inmate poses to the community;
  2. The nature and seriousness of the inmate's offense, the circumstances surrounding the offense, and the inmate's attitude toward it;
  3. The inmate's prior criminal records and his/her adjustment under any previous programs or supervision;
  4. The inmate's attitude toward his/her family, the victim, and authority in general;
  5. The inmate's adjustment while in confinement, including his/her progress in counseling, therapy, and other similar programs designed to encourage the inmate to improve himself/herself;
  6. The inmate's employment history, including his/her job training and skills and his/her stability in the work place;
  7. The inmate's physical, mental and emotional health;
  8. The inmate's understanding of the cause of his/her past criminal conduct;
  9. The inmate's efforts to solve his/her problems such as seeking treatment for substance abuse, enrolling in academic and vocational education courses, and in general using whatever resources the Department of [C]orrections has made available to inmates to help with their problems;
  10. The adequacy of the inmate's overall parole plan. This includes [an] inmate[']s living arrangements, where he/she will live and who he[/she] will live

In *Cooper*, our supreme court explained the Board's procedure is proper "if [the Board] clearly states in its order denying parole that it considered the factors outlined in section 24-21-640 and the . . . factors published in its parole form."  377 S.C. at 500, 661 S.E.2d at 112; *see also Compton v. S.C. Dep't of Prob., Parole & Pardon Servs.*, 385 S.C. 476, 479, 685 S.E.2d 175, 177 (2009) (relying on the holding in *Cooper* to affirm a denial of parole because the parole board "clearly stated in its [order] that it considered the [section 24-21-60] criteria and the criteria set forth in Form 1212").

As found by the ALC, the Board's denial of parole met the requirements of *Cooper* and the ALC had authority to review the decision.[5]  Based on what *Cooper* says

with; the character of those with whom the inmate plans to associate in both his/her working hours and his/her off-work hours; the inmate's plans for gainful employment;

11.   The willingness of the Community into which the inmate will be released to receive the inmate;

12.   The willingness of the inmate's family to allow his/her to return to the family circle;

13.   The attitudes of the sentencing judge, the solicitor, and local law enforcement officers respecting the inmate's parole;

14.   The feelings of the victim's family, and any witnesses to the crime about the release of the inmate[;]

15.   The actuarial risk and needs assessment outlined in section 24-21-10 (F)(1) of the S.C. Code of [L]aws; which evaluates based on Criminal Involvement, Relationships/Lifestyle, Personality/Attitudes, Family, Social Exclusion and Mental Health[; and]

16.   Other factors considered relevant in a particular case by the Board.

South Carolina Department of Probation, Parole and Pardon Services, *Criteria for Parole Consideration*, https://www.dppps.sc.gov/content/download/200476/4681336/file/Criteria+for+Parole+Consideration.pdf

[5] Following the South Carolina Supreme Court's decision in *Cooper*, the General Assembly amended section 1-23-600(D) of the South Carolina Code to provide that "[a]n administrative law judge shall not hear an appeal from an inmate in the custody of the Department of Corrections involving the loss of the opportunity to earn sentence-related credits . . . or an appeal involving the denial of parole to a potentially eligible inmate by the Department of Probation, Parole and Pardon Services."  2008 S.C. Acts No. 334, § 7 (effective June 16, 2008).  The ALC and our supreme court have continued to review these appeals where they implicate an alleged deprivation of due process.  *See Rose v. S.C. Dep't of Prob., Parole &*

about a routine denial of parole, this is a routine denial and the ALC correctly affirmed the Board. We recognize there is tension between the principle that inmates are entitled to a meaningful parole review and what appears to be serial denials of parole based solely on factors that do not change and that have no relation to an inmate's rehabilitation. Even so, we read the authorities to instruct that the court system's role does not include looking behind the Board's statement that it has considered all of the factors and made its decision. As noted by the Board, despite Buchanan's claim that "the Board has denied his request for parole based on the facts and circumstances of the offense[,] which [are] fixed in the past and cannot be changed[,]" Buchanan has not been permanently denied parole and "[j]ust because [he] hasn't received parole yet doesn't mean he never will." *See Furtick*, 352 S.C. at 598, 576 S.E.2d at 149 (stating "the *permanent* denial of parole *eligibility* implicates a liberty interest sufficient to require at least minimal due process") (emphasis in original); S.C. Code Ann. § 24-21-645(D) (Supp. 2022) ("[U]pon a negative determination of parole, prisoners in confinement for a violent crime . . . must have their cases reviewed every two years for the purpose of a determination of parole . . . ."); S.C. Code Ann. § 16-1-60 (Supp. 2022) ("For purposes of definition under South Carolina law, a violent crime includes the offense[] of[] murder . . . .").

---

*Pardon Servs.*, 429 S.C. 136, 144, 838 S.E.2d 505, 510 (2020) (reviewing a claim that Rose had been granted parole in 2001 but remained incarcerated in 2020); *Barton v. S.C. Dep't of Prob., Parole & Pardon Servs.*, 404 S.C. 395, 419, 745 S.E.2d 110, 123 (2013) (reviewing a parole denial for an alleged *ex post facto* violation); *see generally Furtick v. S.C. Dep't of Prob., Parole & Pardon Servs.*, 352 S.C. 594, 598, 576 S.E.2d 146, 149 (2003) (reviewing an appeal from the Board's decision finding Furtick ineligible for parole because an inmate has a liberty interest in gaining access to the Board and a permanent denial of eligibility implicates a liberty interest requiring due process); *Al-Shabazz v. State*, 338 S.C. 354, 376–77, 527 S.E.2d 742, 754 (2000) (finding the ALC has the authority to review non-collateral and administrative agency decisions); *cf. Allen v. S.C. Dep't of Corr.*, 439 S.C. 164, 171, 886 S.E.2d 671, 674 (2023) (explaining "[an inmate's grievance] claim that implicates a state-created liberty or property interest is not required for the ALC to have subject matter jurisdiction over the appeal. However, the ALC is not required to hold a hearing in every matter and may summarily dismiss an inmate's grievance if it does not implicate a state-created liberty or property interest sufficient to trigger procedural due process guarantees").

The Board asserts as long as its notice of rejection states it followed the statutory and Form 1212 criteria, its order of denial is valid. Based on the law currently existing in South Carolina, we must agree. However, we are concerned regarding the perfunctory manner in which Buchanan's request for parole was denied. Although Buchanan and other juveniles similarly situated are technically eligible for parole, the continuing denial of parole based on the same factors, all unchangeable and related to their offenses, gives no guidance to these inmates about what can be done to improve their chances of parole and is very nearly equivalent to being ineligible for parole. Under the current system, it appears no passage of time served (here, forty-seven years) or showing of rehabilitation (here, eighteen parole reviews now indicating Buchanan "has more than demonstrated his rehabilitation") can change his fate before this Board. The public policy behind *Roper*, *Graham*, and *Miller*, to restore hope to juvenile offenders for some life outside of prison, is thwarted by the Board's continued reliance on factors existing at the time of the conviction with little or no apparent consideration of subsequent rehabilitation efforts. The prospect of parole, including meaningful parole hearings, incentivizes good conduct while imprisoned and encourages participation in rehabilitative programs, which reduces recidivism rates. *See* Amanda Dick, *The Immature State of Our Union: Lack of Legal Entitlement to Prison Programming in the United States as Compared to European Countries*, 35 Ariz. J. Int'l & Compar. L. 287, 291 (2018). Additionally, parole reduces prison populations by releasing rehabilitated inmates, lessening the fiscal burden of incarceration by eliminating spending on the detention of individuals who no longer pose a threat to society.

In this case, Buchanan argues he confessed, he accepted the advice of his attorney to plead guilty, "his attorney virtually guaranteed him that he would be paroled in less than twenty years[,]" and the jury recommended mercy. He has been imprisoned for fifty years for a crime he committed at age seventeen. And there appears to be no dispute—none—that he has been an exemplary inmate and demonstrated remorse, rehabilitation, and a low risk for recidivism.

We reluctantly affirm the ALC's finding that the Board followed the proper procedure when it denied Buchanan parole because the Board's order of denial stated the Board had considered "the factors outlined in [s]ection 24-21-640" and "the factors published in Department Form 1212." *See Risher v. S.C. Dep't of Health & Env't Control*, 393 S.C. 198, 204, 712 S.E.2d 428, 431 (2011) ("A decision of the ALC should be upheld . . . if it is supported by substantial evidence in the record."); *Cooper*, 377 S.C. at 500, 661 S.E.2d at 112 (providing the procedure for denying parole is proper "if [the parole board] clearly states in its

order denying parole that it considered the factors outlined in section 24-21-640 and the fifteen factors published in [Form 1212]"); *Compton*, 385 S.C. at 479, 685 S.E.2d at 177 (affirming a denial of parole because the parole board's order complied with the *Cooper* requirements). Although the Board has complied with the minimal requirements necessary for this to satisfy the standard our supreme court articulated in *Cooper*, we are sympathetic to Buchanan's argument that it appears inmates who offended while juveniles are not given meaningful review regarding parole. Our role is one that is limited to operating within the framework set by statutory law and by our supreme court's precedents. It may well be good policy for the Legislature to review and/or revise the parole system to assure the factors of youth are a part of considering parole in these cases rather than permitting the seemingly perfunctory review now standardly given, but that is the Legislature's decision, not ours.

## B.      Cruel and Unusual Punishment

Buchanan argues the Board's multiple denials of parole over so many years violates the cruel and unusual punishment prohibitions in the United States and South Carolina Constitutions. We disagree.

The United States Constitution provides, "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII. The South Carolina Constitution provides, "Excessive bail shall not be required, nor shall excessive fines be imposed, nor shall cruel, nor corporal, nor unusual punishment be inflicted, nor shall witnesses be unreasonably detained." S.C. Const. art. I, § 15. Under either Constitution, we find no violation.

"[P]arole is a privilege, not a matter of right . . . . Parole is a creature of statute and is exclusively in the province of the legislative branch of government. The General Assembly empowers the Department to administer the parole program." *Major v. S.C. Dep't of Prob., Parole & Pardon Servs.*, 384 S.C. 457, 465, 682 S.E.2d 795, 799 (2009). "[T]he *permanent* denial of parole *eligibility* implicates a liberty interest sufficient to require at least minimal due process." *Furtick*, 352 S.C. at 598, 576 S.E.2d at 149.

> A State is not required to guarantee eventual freedom to a juvenile offender . . . . What the State must do, however, is give defendants . . . some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation. It is for the State, in the first instance, to

> explore the means and mechanisms for compliance. It
> bears emphasis, however, that while the Eighth
> Amendment prohibits a State from imposing a life
> without parole sentence on a juvenile non[-]homicide
> offender, it does not require the State to release that
> offender during his natural life.

*Graham*, 560 U.S. at 75. We agree with the ALC that neither the United States Supreme Court nor our supreme court requires specific parole criteria to be considered in determining whether to grant parole, and the Board's denial of parole did not constitute cruel and/or unusual punishment under either Constitution.

**CONCLUSION**

Based on the foregoing, the order of the ALC is

**AFFIRMED.**

**MCDONALD and HEWITT, JJ., concur.**